# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

EDWARD ANGEL,

   Plaintiff,

v.               No. CIV 07-579 LFG


MICHAEL J. ASTRUE,
Commissioner of Social
Security Administration,

   Defendant.

## MEMORANDUM OPINION
## AND ORDER OF REMAND

   Plaintiff Edward Angel ("Angel") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Angel was not eligible for disability insurance benefits ("DIB") or supplemental security income benefits ("SSI"). Angel moves this Court for an order reversing or remanding for a rehearing. [Doc. 20.]

   Angel was born on October 12, 1966 and was 39 years old when the administrative hearing was held. [Tr. 64, 82.] He dropped out of school in the eighth grade, and in 1998, completed truck driving school. [Tr. 82.] He is married and lives with his three children. Angel has past relevant work experience as a truck driver, vehicle detailer, farm laborer, gas station attendant, and roofer. [Tr. 17.]

On October 6, 2003, Angel applied for DIB and SSI benefits.[1]  [Tr. 64, 359.]  He alleged a disabling condition consisting of "schizophrenic problems, high blood pressure ("HBP"), and depression," with an onset date of January 1, 2003.[2]  [Tr. 64, 76.]  A later-filed request for administrative hearing contains allegations that Angel has a "psychotic disorder with delusional thinking and depression, along with asthma, obesity and hypertension."  [Tr. 37.]

On December 7, 2005, Administrative Law Judge ("ALJ") Larry Johnson held an administrative hearing, during which Angel was represented by a non-attorney.  [Tr. at 369.]  On September 6, 2006, Judge Johnson issued an unfavorable decision, denying Angel's requests for benefits.  [Tr. 16-22.]  The ALJ determined that Angel had the residual functional capacity ("RFC") to perform unskilled work with limited public contact at the sedentary level of exertion.  In applying the grids as a framework, the ALJ determined there was a significant number of jobs existing in the national economy that Angel could perform.  [Tr. 22.]  Thus, the ALJ concluded Angel was not disabled within the meaning of the Social Security Act and Regulations.  [Tr. 22.]

On April 6, 2007, the Appeals Council denied Angel's request for review.  [Tr. 5, 9.]  This appeal followed.  [Doc. 20.]

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process,

---

[1]In June 2001, Angel previously applied for DIB and SSI.  [Tr. 68, 365]  However, that application was denied in August 2002 because of Angel's return to work.  [Tr. 115.]

[2]These allegedly disabling conditions are taken from Angel's 1991 Disability Report Adult because there is no Disability Report accompanying the 2003 application for benefits.

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, he is capable of performing other work.[10]

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[11]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant nonexertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (relying on Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). Nonexertional limitations can include mental impairments. The grids do not consider nonexertional limitations; therefore, if significant nonexertional limitations are present, the grids may not be applicable. Id. However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.) In this case, Judge Johnson made his determination at step 5 of the sequential process and relied on the grids as a framework for his ruling. Although a vocational expert attended the hearing, the VE provided no testimony.

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and

---

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In a detailed decision, Judge Johnson made the following findings: (1) Angel had not engaged in substantial gainful activity since the alleged onset of his disability; (2) Angel had severe impairments, including depression, obesity and diabetes mellitus; (3) Angel's impairments did not meet or medically equal one of the listed impairments; (4) Angel's allegations of a complete inability to work were not wholly credible based on the medical history, findings made on examination and reports of treating and evaluating sources; (5) Angel had the RFC to perform unskilled work with

limited public contact at the sedentary level of exertion; (6) Angel's obesity did not further restrict his ability to perform sedentary work activities; (7) Angel was unable to perform his past relevant work; (8) Angel was 39 years old, which is defined as a younger individual and had an eighth grade education; (9) at step five, Judge Johnson found that in relying on the RFC and Angel's vocational factors, the grids directed a conclusion of not disabled; and (10) in using the grids as a framework for decision-making, the ALJ concluded that there was a significant number of jobs that existed in the national economy that Angel could perform.  [Tr. 21-22.]

### Summary of Angel's Work History and Medical Records

#### *2001 Medical Records*

Angel's earliest medical records begin in 2001, although there are some references to medical problems or treatment in 1997.  While the Court summarizes essentially all of the medical records, even those from 2001, the pertinent regulations state that the agency will develop a claimant's complete medical history for at least 12 months preceding the month in which the benefits application was filed.  20 C.F.R. § 404.1512(d).  Here, Angel's second benefits application was filed in October 2003.  Thus, medical records from October 2002 are considered, some of which were discussed by the ALJ in his opinion.  [Tr. 19.]

On May 15, 2001, Angel was being seen at the Southwest Counseling Center.  According to the record, Angel had lost 13 jobs in the past three years and it was affecting his self esteem.  He reported he was depressed.  [Tr. 235.]  The intake form [Tr. 237] indicates no significant problems.  Angel was being treated for high blood pressure ("HBP") and heartburn and taking medications for

those conditions.  He had taken Prozac[12] three years ago when treated at Southwest Counseling Center.  [Tr. 244.]  Angel's problems with depression related to his history of losing jobs.  He complained that his co-workers were mean to him.  Angel was arrested for a DWI in 1993 but reported no problems with alcohol since then even though he occasionally drank.  Angel began drinking when he dropped out of the eighth grade.  [Tr. 246.]  He quit his truck driving job three weeks ago and was not currently earning any money.  The clinician's impressions of Angel were that he was shy, very quiet and paranoid.  He continued to quit jobs because he thought his co-workers were talking badly about him.  Angel was referred to the adult outpatient mental health team for individual therapy.  [Tr. 247.]  He was diagnosed with Adjustment Disorder with Depressed Mood and assigned a GAF of 60.[13]  [Tr. 248.]

On May 31, 2001, Angel attended a counseling session.  Again, he discussed his inability to maintain a job and thoughts that others were talking about him, especially about his obesity.  He believed people had pre-formed opinions about him which prevented him from obtaining a job and that people were trying to sabotage him.  [Tr. 227-28.]  Angel was never hospitalized for psychotic problems.  The medical records discussed from 1997 indicated Angel was prescribed Xanax[14] and Prozac and diagnosed then as a paranoid schizophrenic.  At some point, Angel was diagnosed with delusional disorder, persecuting type.  [Tr. 229.]  The health care provider noted that Angel appeared

---

[12]Prozac is an antidepressant medication used to treat a variety of conditions, including depression and other mental/mood disorders.  www.webmd.com

[13]The GAF is used by clinicians to report an individual's overall level of functioning. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) (DSM-IV-TR).  A score of 51-60 indicates moderate symptoms, such as a flat affect, or moderate difficulty in social or occupational functioning. Id. at 34.

[14]Xanax or Alprazolam is used to treat anxiety and panic disorders.  www.webmd.com

depressed, lacked judgment, revealed fragmented thoughts, used slow speech and had hallucinations.
[Tr. 233.] He was diagnosed with psychotic disorder, asthma, HBP, GERD, and obesity. He was
unemployed and had difficulties maintaining a job. The GAF is illegible but may indicate 50 [15] or 60.
[Tr. 234.] He was started on Prolixin.[16]

On June 4, 2001, Angel complained to the doctor that he had trouble sleeping since starting
the Prolixin. He also felt anxious. He was prescribed Cogentin.[17] [Tr. 226.] On June 8, 2001, Angel
was seen by a nurse. He was "jittery." There was some improvement on the Prolixin and Cogentin
but Angel still felt "antsy." He was less paranoid and could talk to people more easily. He also was
sleeping better. He was prescribed Geodon[18] and was to reduce the Prolixin. [Tr. 225.]

Angel did not show up for his medical appointment on June 13, 2001. [Tr. 224.] A later
medical note indicates Angel was out of town on June 13th. He still felt somewhat paranoid but was
coping with it better. [Tr. 223.] On June 22, 2001, Dr. Vargas noted that Angel felt less agitated

---

[15] A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." (emphasis omitted) Diagnostic & Statistical Manual of Mental Disorders, at 34.

[16] This medication is used to treat symptoms of a certain type of mental/mood condition (schizophrenia). Prolixin or Fluphenazine belong to a class of medications called phenothiazines and are also referred to as a neuroleptic. The medication works by affecting the balance of natural chemicals (neurotransmitters) in the brain. Some of the benefits of continued use of this medication include reduced episodes of hallucinations, delusions, or bizarre behaviors that occur in patients with schizophrenia. www.webmd.com

[17] Cogentin or Benztropine is used to treat symptoms of Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs (antipsychotics such as chlorpromazine/haloperidol). www.webmd.com

[18] This medication is used to treat certain mental/mood disorders (schizophrenia or manic/mixed episodes associated with bipolar disorder). It may be used after other medications have not been effective. Geodon or Ziprasidone is a psychiatric medication (anti-psychotic type) that works by helping to restore the balance of certain natural substances (neurotransmitters) in the brain. www.webmd.com

than when taking Prolixin.  Angel was still paranoid and anxious around larger groups of people.  He also was not compliant with the medications.  [Tr. 222.]

On June 26, 2001, Angel filed the first application for DIB and SSI that was eventually denied because he was employed.  [Tr. 68.]  During a face-to-face interview with the social security employee, Angel stated that he felt people were talking about him.  [Tr. 71.]  In the 2001 disability report, his weight was 315 pounds.  Angel alleged he had schizophrenic problems, HBP and depression and that the onset of these problems was May 2001.  [Tr. 75-76.]  He stopped working in April 2001, allegedly because of "schizophrenic problems."

On July 20, 2001, Angel reported that he did not feel Geodon was effective.  He had gone to Oklahoma for a job interview but felt people were talking behind his back.  The doctor noted that Angel was vague about his symptoms but that the symptoms he did report had a "distinctly paranoid character."  [Tr. 221.]  The prescription for Geodon was increased.

At a counseling session on August 20, 2001, Angel continued to feel paranoid.  He also was convinced that one of the counselors had informed a prospective employer of Angel's paranoia.  Angel was taking the Geodon at half-strength rather than as prescribed.  He continued to be very paranoid and appeared very anxious.  He was encouraged to take the full dosage of medications.  Buspar[19] was added to his medications.  [Tr. 218.]

There is a Southwest Counseling Center summary record, dated August 21, 2001.  [Tr. 250.] During the last quarter, Angel was in danger of losing his home because he could not afford the basic utility payments.  The Center was able to obtain help for Angel.  The record notes that Dr. Vargas,

---

[19]This medication is used to treat anxiety. It may help one think more clearly, relax, worry less, and take part in everyday life. It may also help one to feel less jittery and irritable, and may control symptoms such as trouble sleeping, sweating, and pounding heartbeat.  www.webmd.com

the Center's psychiatrist, diagnosed Angel with Psychotic Disorder NOS.  This record also observes Angel's allegation that therapists at the Center were in contact with Angel's potential employers and that this affected his ability to be hired.  Angel's diagnosis was updated to Paranoid Personality Disorder.  Angel was transferred to a different therapist in August 2001.  His GAF at this time was 45.  [Tr. 252.]

A September 1, 2001 work history report indicates that Angel was a truck driver from 1998 until 2001, but this included various employers.  He worked in detailing vehicles from 1994 to 1998, again for different employers.  He was a farm laborer from 1992 - 1994, a truck driver in 1992 and a gas station attendant in 1988 for five months.  Angel was a roofer from 1985-1988 and a farm laborer from 1980-1982.  He stated that he began working at age 14.  [Tr. 85-92.]

In September 2001, his daily activity form indicates that Angel lived at home with his wife and three children.  He felt tired and depressed.  He did not work around the house and did not enjoy being around his family.  He could not walk on a regular basis.  He was able to drive and to attend to his personal grooming needs.  [Tr. 93.]  He could not tie his shoes due to his weight.  Angel believed his depression prevented him from engaging in family activities.  He felt paranoid.  He could plan his day and get to appointments but he sometimes had trouble following instructions.  [Tr. 94, 95.]

On September 18, 2001, Angel still felt paranoid and unable "to deal" with people.  He was working some odd jobs.  Angel was worried about having these symptoms forever.  He had only been taking Geodon at half strength because it made him feel sleepy.  [Tr. 217.]

An October 3, 2001 counseling record indicates diagnoses of paranoid personality disorder and delusional disorder.  Angel was highly dependent on his wife for direction.  He was physically able to perform work and he wanted to provide financial support for his family.  [Tr. 208.]

On October 19, 2001, Angel reported that he felt people were talking about him.  He felt worthless.  The Geodon had decreased his need to isolate and his paranoia slightly.  He was also taking Zoloft.[20]  On November 16, 2001, Angel continued to feel people were talking about him.  He was feeling a little better but also anxious. The Geodon made him "jumpy."  On December 28, 2001, Angel reported that people were talking badly about him.  His complaints of paranoia had increased.  Other medications were started.  [Tr. 203.]

### 2002 Medical Records

On January 14, 2002, Angel saw Dr. Shinnick for depression, paranoia, anxiety and trouble with crowds.  He was taking Risperdal,[21] Zoloft and Buspar.  He reported having lost several jobs in the past year.  Paranoia was his biggest problem.  The physician noted Angel's anxious mood.  His medications were again changed.  [Tr. 202.]  On February 20, 2002, Angel did not show up for his appointment with Dr. Shinnick.  [Tr. 201.]

On April 29, 2002, Angel reported to the therapist that he was doing "ok."  His weight was 303 pounds.  He was pleased with his weight loss and also pleased that he had been able to keep his present truck driving job for four months.  Sometimes he skipped taking his medications because he did not want his work partner to know he was taking medications.  [Tr. 199.]

---

[20]Zoloft or Sertraline is used to treat depression, panic attacks, obsessive compulsive disorders, post-traumatic stress disorder, social anxiety disorder (social phobia).  www.webmd.com

[21]Risperdal or Risperidone is used to treat certain mental/mood disorders (schizophrenia, manic phase of bipolar disorder, irritability associated with autistic disorder). This medication can help you to think clearly and function in daily life.  www.webmd.com

Angel's May 31, 2002 daily activity form indicated he did not do household chores or prepare meals. He went to the landfill once a month and could drive to his doctor appointments. He could not go to family gatherings because of paranoia or panic attacks. [Tr. 97.] He sometimes did household and yard chores. It was difficult for him to leave the house and he hated being in crowds. He had no hobbies. [Tr. 99.] Angel listened to the radio and watched television but did not visit friends or family because of feelings of paranoia or panic. [Tr. 100.] He was unable to sleep when he felt stressed. [Tr. 101.] Angel needed assistance putting on his socks or tightening his belt. [Tr. 102.] He did not feel suicidal. He was able to walk one block without stopping and to climb stairs. [Tr. 103.] He stated he was trying to hold onto his job but was having trouble. [Tr. 106.]

A note in the social security file (from his earlier application) noted that Angel was unable to keep the consultative exam in June 2002 because he was working then and out of town. [Tr. 107.] On June 26, 2002, Angel filled out a work activity report. He had started working for a trucking company in February 2002. He had attempted other jobs briefly, yard maintenance and construction, but the jobs did not work out. Angel was concerned he might be fired from his present job because of his medical condition. [Tr. 113.]

On August 14, 2002, Angel's first application for DIB and SSI benefits was denied because of significant gainful employment. [Tr. 115.]

On September 10, 2002, Angel reported to the therapist that he was not taking his medications. He stopped the medications five months ago because they made him too drowsy. He was suffering from anxiety and insomnia. He was upset about quitting his job. His employer reduced his miles and work load until Angel quit three weeks ago. Angel was looking for another job. The

employment situation was straining his marriage.  He was to see Dr. Shinnick and start his medications again.  [Tr. 196.]

On September 17, 2002, Angel was resting a little better after resuming his medications.  He still felt depressed and frustrated about not being able to find or hold a job.  He worried about providing for his family.  His medications were adjusted.  [Tr. 194.]

On September 30, 2002, Angel did not show up for his appointment with Dr. Shinnick.  On November 20, 2002, he told the therapist he continued to feel stressed and persecuted.  His wife briefly left him but he convinced her to return.  He complained of depression and anxiety.  He was to restart Zoloft and Risperdal.  [Tr. 190.]  A November 20, 2002 counseling record indicates diagnoses of depressive disorder NOS, Psychotic disorder NOS, and obesity.  His GAF was 58.  [Tr. 191.] On December 10, 2002, Angel stated he felt Risperdal was effective.  He appeared fairly stable with his current medications.  [Tr. 189.]

### *2003 Medical Records*

January 1, 2003, is the onset date for Angel's alleged disability with respect to the current application for benefits.  [Tr. 16.]

On January 6, 2003, Angel saw Dr. Shinnick for depression, anxiety and agoraphobia.  Angel continued to lose jobs.  He also had problems being in crowds but reported feeling less depressed.  He was sleeping well.  He appeared very anxious and still was not working.  He was taking Zoloft and Risperdal.  [Tr. 197.]

On February 3, 2003, Angel reported to the therapist that he was doing fairly well.  Reducing the Zoloft had helped with some of the side effects.  He still felt paranoid but not to the same degree.

-13-

He would like to work a little but he recognized he would be unable to maintain full time employment if he obtained SSI benefits.  He was tolerating his medications without side effects.  [Tr. 188.]

On March 3, 2003, the record notes a history of paranoid ideas that started in 1996-97.  Angel believed people at his jobs talked about him which caused him to quit jobs.  He had tried multiple medications with minimal improvement.  He appeared calm with mild anxiety.  New anti-depressant medications were prescribed.  [Tr. 186.]

In March 2003, Angel saw the doctor for respiratory illnesses.  An April 7, 2003 treatment plan listed mental health delusions, mental health paranoia, "SC community resources" and inadequate financial help.  He had applied for food stamps.  [Tr. 177.]

On April 28, 2003, Angel told the therapist that he was upset about not being able to find a job.  His wife had lost her job.  Angel was diagnosed with diabetes mellitus II ("DM").  He tended to isolate himself.  He walked 30-45 minutes each day for two weeks.  He tolerated his current medications without side effects.  He felt stressed.  [Tr. 175.]

On August 14, 2003, Angel visited a different treatment center for a mental health assessment.  He complained of hearing knocking on the door and paranoia.  He had not been taking his medications for two months.  He lost a job on July 1, 2003 because he quit when "they messed with his head."  He had been seen at the Southwest Counseling Center for awhile and reported they said he was "paranoid."  [Tr. 332.]  Angel explained to the new therapist (Glasscock) that he quit jobs because he thought his employers were out to get him.  This pattern began about six years ago.  [Tr. 334.]  He did not want to be around anyone, was very irritable and felt a lot of stress.  He was not sleeping well.  Angel was eating more and had gained 30 pounds in three months.

Angel also reported having used alcohol for 15 years and that his last drink was last week. [Tr. 338.]  He had also used marijuana and cocaine in the past.  Much earlier, Angel had smoked marijuana for a period of 18 years.  He had used cocaine only once twenty years ago.  His longest period of sobriety (from alcohol) was one week, at the present appointment.  [Tr. 338.]  He reported convictions for two DWI's in 1993 and 1985.  [Tr. 341.]

Angel appeared passive, cooperative, agitated and restless.  He complained of auditory hallucinations.  The provider noted a "severe deterioration level of functioning" and vegetative symptoms.  Because of the hallucinations and his feelings of paranoia, the health care provider recommended that Angel be admitted to the adult unit.  Angel signed a refusal to allow that care and was referred for individual counseling.  [Tr. 344-46.]  His GAF was 38.[22]

On September 19, 2003, Angel saw Glasscock and appeared calmer.  His paranoia was reported to be "static."  Angel or the therapist doubted that Risperdal was making a difference.  He was also taking Serzone.[23]  [Tr. 330.]  Another medical record dated September 19, 2003, records the many different medications Angel had tried.  [Tr. 173.]

On September 25, 2003, Angel did not feel as anxious or worried.  He complained that Seroquel made him too "sleepy."  A trial of Geodon was started.  [Tr. 329.]

On October 5, 2003, Angel still had a cough and weighed 327 pounds.  [Tr. 278.]

On October 6, 2003, Angel filed his second application for SSI and DIB.  [Tr. 64, 359.]

---

[22]A GAF score of 31-40 indicates "some impairment in reality testing or communication or major impairment in reality testing or communication or major impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Id. Salazar v. Barnhart, 468 F.3d 615, 624 n. 4 (10th Cir. 2006) (quotation omitted).

[23]This medication is used to treat depression.  www.webmd.com

On October 16, 2003, Angel reported to Glasscock that he could not take Geodon because it was "knocking him out."  He was given a trial of Lexapro[24] and was to continue on Serzone.  [Tr. 329.]

On October 16, 2003, David Sachs, Ph.D. performed a psychological evaluation at the recommendation of Frances "Sam" Glasscock.  [Tr. 331.] Angel reported difficulties retaining jobs, some paranoid ideation and a variety of indications of depression and anxiety.  All of these complaints appeared to relate to work situations.  Angel described himself in negative terms.  He tested positively for anxiety, depression, and paranoia.  He manifested anxiety both cognitively and  affectively.  Angel's depression was appreciably stronger than his anxiety.  He was resentful and manifested persecutory ideation.  He was socially detached and tended to be self-focused.  He might benefit from anti-psychotic medications.  The diagnostic considerations included major depression with some psychotic features.  Angel felt he was the target of a conspiracy.  [Tr. 331.]

Dr. Sacks also performed a personality assessment inventory and provided a thorough write-up on the testing performed.  He diagnosed Angel with a major depressive episode and wished to rule out borderline personality disorder.  [Tr. 167, 168.]

On November 13, 2003, Glasscock wrote a letter to the Department of Human Services on behalf of Angel.  Glasscock stated that Angel had been under her care since August 2003 and was being treated for depressive, anxiety and paranoid disorders.  Glasscock stated in the letter that Angel could not manage working outside his home.  He had been taking medications (Abilify[25] and

---

[24]Lexapro or Escitalopram is an antidepressant (selective serotonin reuptake inhibitor-SSRI) used to treat depression and anxiety.   www.webmd.com

[25] Abilify or Aripiprazole is used to treat certain mental/mood disorders (e.g., bipolar disorder, schizophrenia). Aripiprazole is known as an antipsychotic drug (atypical type). It works by helping to restore the balance of certain natural chemicals in the brain (neurotransmitters).  This medication can decrease hallucinations

Wellbutrin) but his symptoms were resistant to treatment.  Multiple medical trials had been attempted.

Glasscock recommended that Angel not work outside the home.  [Tr. 328.]

On December 5, 2003, a social security employee interviewed Angel and observed that he was

having trouble breathing, understanding, concentrating, answering, walking and writing.  [Tr. 116.]

The interviewer noted that Angel was overweight, "got mad very easily" and that it was a difficult

interview.  [Tr. 117.]

On December 27, 2003, Angel saw the physician and complained of chest and shoulder pain.

He was given Xanax.  [Tr. 275.]

### *2004 Medical Records*

On March 18, 2004, Angel saw Glasscock and complained again about his failed attempts to

secure employment because the "old thoughts" interfered.  He further complained that co-workers

did not show him how to do the job, did not orient him well to the work and wanted to "get rid of

him."  Angel had his good days and "down" days.  His energy level was low.  His wife had forced him

to return to the clinic.  He claimed that it "isn't me; it is them; they are trying to drive me crazy."

Paranoid personality was noted and more medications were prescribed.  [Tr. 327.]

On March 28, 2004, Angel filled out a daily activity form.  He typically got up in the morning,

sent the children to school, and tried to do some household chores.  Sometimes he cooked.  He took

all of his prescribed medications.  He sometimes attempted to do more activities but his weight and

energy level held him back.  He was able to go to his doctors' appointments but could no longer run

errands.  He could drive although he had some trouble getting into and out of the car.  [Tr. 119.]

---

and improve your concentration. It helps you to think more clearly and positively about yourself, feel less nervous, and take a more active part in everyday life. Aripiprazole can treat severe mood swings and prevent or decrease how often mood swings occur.  www.webmd.com

He reported he had sleep apnea and was using a CPAP machine. [Tr. 123, 124.] Angel had worked for many different employers but had difficulty holding onto any one job for long. He was depressed because he could not provide for his family. He felt anxious and suffered from anxiety attacks. He was paranoid about people. [Tr. 124.]

On April 21, 2004, Dr. E. Chiang filled out a Psychiatric Review Technique form for the SSA. She found Angel had an affective disorder. She described him as having a depressive syndrome characterized by appetite disturbance with a change in weight, decreased energy, difficulty concentrating, hallucinations or delusions or paranoid thinking. [Tr. 258.] She rated him as being mildly limited in daily activities, moderately limited in social interactions, and mildly limited in maintaining concentration. [Tr. 265.] None of the "C" criteria were met. [Tr. 265.]

Dr. Chiang also filled out a RFC form. Angel was moderately limited in his ability to work with others, but not significantly limited in any area. [Tr. 269.] He was moderately limited in his ability to interact with the general public, to accept instructions and to respond to changes in the work setting. There were no marked limitations. [Tr. 270.] His diagnosis was major depression. At this time, Angel was taking Haldol[26] and Wellbutrin.[27] He remained anxious. He alleged schizophrenia but there was no current diagnosis for that condition. Dr. Chiang concluded Angel could perform work with limited public contact. [Tr. 271.]

---

[26]Haldol or Haloperidol is used to treat certain mental/mood disorders (e.g., schizophrenia, schizoaffective disorders). This medicine helps you to think more clearly, feel less nervous, and take part in everyday life. It can also help prevent suicide in people who are likely to harm themselves. It also reduces aggression and the desire to hurt others. It can decrease negative thoughts and hallucinations. www.webmd.com

[27]Wellbutrin or Bupropion is used to treat depression. It can improve your mood and feelings of well-being. www.webmd.com

A May 30, 2004 medical record indicates Angel was taking Haldol and other medications. The doctor discussed weight loss with Angel through exercise and diet.  Angel still complained of paranoid delusions and conspiracy.  [Tr. 273.]

On June 1, 2004, Glasscock's notes stated that Angel "stopped job. unhappy with process. had a lot of deductions."  "They were doing things on purpose."  "They would do these things to me."  "He was trying to get to me."  "He isn't all there."  "I just want to get out of that place."  "I just can't take the things they say."  Other medications were considered.  [Tr. 325.]

There is a disability report appeal, dated June 23, 2004.  [Tr. 129.]  Angel stated he had a lot of side effects from medications, including anxiety and drowsiness.  His moods were not stable.  He became nervous around people and felt they were talking about him.  He was uncomfortable leaving home and could only walk ½ block due to shortness of breath.  He was unable to stand for more than 5-10 minutes due to fatigue in his back.  Angel suffered from sleep apnea, obesity, HTN, and asthma. [Tr. 129.]  He had been provided mental health care from September 2003 until the present for depression, paranoia, and delusions.  He did not bathe or dress due to depression and stayed at home to avoid people.  [Tr. 132, 133.]  He had worked for a trucking company for 2 ½ weeks but he stopped because of "mental illness."  [Tr. 135.]

In his request for reconsideration, dated June 25, 2004, Angel stated he was severely disabled due to delusional thinking and additional impairments due to asthma, sleep apnea and obesity.  [Tr. 42.]

On June 28, 2004, Angel complained to Glasscock that he felt helpless and that people were against him now.  The Thorazine made him sleepy.  [Tr. 324.]  On July 12, 2004, Angel stated he felt safe when he was inside his home, "enclosed."  [Tr. 323.]

On September 1, 2004, Glasscock's record contains handwritten notes that Angel's problems began in 1997.  He had a history of alcoholism to the point of suffering blackouts.  He felt like a failure.  [Tr. 322.]  However, on September, 20, 2004, Angel stated he was getting out of the house to go to his son's ballgames where he sat under a tree.  Angel was able to get some housework done as well.  His family was treating him like he was a child.  [Tr. 321.]  On October 5, 2004, Angel told Glasscock that he felt better when he was at home.  He was restless and disheveled looking.  New medications were considered.  [Tr. 320.]  On October 26, 2004, Angel was still "hiding out."  He talked about losing weight.  He was given samples of Klonopin.[28]  [Tr. 319.]

There is a "recent medical treatment" form from perhaps December 2004.  It states Angel was seen at First Care Clinic in Las Cruces from June 2004 to the present and seen by Glasscock every 1-2 months from September 2003 to the present.  [Tr. 148.]  Glasscock was trying to find the right medications for his anxiety and depression but said Angel would probably always suffer from these problems.  Dr. Barbosa diagnosed Angel with DM earlier in the year.  He was taking Wellbutrin for depression, Lorazepam[29] for anxiety as needed, Lithobid[30] and Eskalith[31] for mood swings, Soma[32]

---

[28]Klonopin or Clonazepam is used to treat seizure disorders and panic attacks. It belongs to a class of medications called benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect.  www.webmd.com

[29]This medication is used to treat anxiety.  www.webmd.com

[30]See Lithium.

[31]See Lithium.

[32]This medication is used to treat pain and discomfort from muscle injuries such as strains, sprains, and spasms. It is usually used along with rest, physical therapy, and other treatments (e.g., anti-inflammatory medication).  www.webmd.com

for neck spasms, Avandia[33] for DMII, Norvasc[34] for HTN, Metformin[35] for DMII, Inderal[36] for HTN,

Zantac for gastritis and Albuteral for asthma.  [Tr. 149.]

On December 9, 2004, Angel told Glasscock that he felt people were talking badly about him.

He suffered from increased panic attacks and anxiety.  [Tr. 317.] On December 12, 2004, Angel was

taking Lithium.  [Tr. 301.]

On December 15, 2004, Angel requested an ALJ hearing.  He alleged he had a psychotic

disorder with delusional thinking and depression.  His asthma, obesity and hypertension caused

further limitations.  [Tr. 36.]

### *2005 Medical Records*

On January 6, 2005, Angel reported to Glasscock that he felt better being alone.  He still felt

"social anxiety."  He was getting up one to two times a night.  His blood pressure was better

controlled with medications.  He was on Lithium.  Panic and social anxiety were still major problems.

[Tr. 316.]

On January 24, 2005, Angel was calmer.  He stated he had been "ok" but had not been going

out anywhere.  He was continuing to try to get out of the house.  [Tr. 315.]  On March 3, 2005, he

told Glasscock that when his nephew was to come to visit, Angel felt sick and his heart started

---

[33]Avandia or Rosiglitazone is an anti-diabetic drug (thiazolidinedione-type, also called "glitazones") used with a proper diet and exercise program to control high blood sugar in patients with type 2 diabetes (non-insulin-dependent diabetes).   www.webmd.com

[34]Norvasc or Amlodipine is used with or without other medications to treat high blood pressure (hypertension), certain kinds of chest pain (chronic stable angina, vasospastic angina, coronary artery disease). www.webmd.com

[35]Metformin is used with a proper diet and exercise program to control high blood sugar in people with type 2 diabetes (non-insulin-dependent diabetes).   www.webmd.com

[36]This medication is a beta blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions.  www.webmd.com

pounding.  Angel then felt better after he got busy.  He believed his relatives were talking about him.  [Tr. 314.]

On May 20, 2005, Angel reported he still had not heard from the Social Security Administration.  He was better but having marital problems.  [Tr. 313.]  On June 17, 2005, Angel was upset and stated his paranoia was affecting his marriage.  His children looked at him like he was crazy.  [Tr. 312.]

Angel's diabetes was controlled as of August 2005.  [Tr. 293.]

On October 10, 2005, Angel still was experiencing paranoia.  He was staying away from the family.  [Tr. 310.]  On November 15, 2005, Angel reported that some days were good.  He felt paranoia and jealousy.  Glasscock noted that Angel was "doing better" on this date.  [Tr. 309.]

On December 7, 2005, the ALJ hearing was held in Las Cruces.  [Tr. 369.]  Angel was represented by a non-attorney.  He was unemployed.  His last job was driving a truck but he had problems holding a job because he thought people were out to get him and wanted him to lose his job.  [Tr. 374.]  He first started to have this problem in 1997.  He believed he had held 15-20 jobs since 1997.  [Tr. 375.]  The longest job he held might have been for 8 months to a year.  [Tr. 376.]  Sometimes, he complained that certain promises were made to him at work that were not fulfilled.  He also had trouble being around a lot of people, which he described as being 5-8 people.  [Tr. 377.]  He did not feel like he "fit in."  He believed his co-workers talked about him.  [Tr. 377.]

Angel was able to do some housework during the day and still drive a car.  He could go shopping with his wife and children, but was unable to shop alone.  If he ran errands alone, he started to have a panic attack and had to leave.  His panic attacks included sweating, a pounding heart, and

trembling or shaking.  This also happened if people were going to visit Angel at home.  [Tr. 380.] Angel believed these problems started in 1997 when his wife became ill with cancer.

Angel also did not feel he could always trust his therapists or his family.  He felt his family talked about him.  He started working at age 13 or 14 and his family turned its back on him.  The medications had helped a little but he had the same problems.  [Tr. 387.] Angel weighed 228 pounds at this time but stated his normal weight was 185.  [Tr. 388.] He had gained that weight over a five-year period.  He believed his depression made him eat more.

Angel's wife also testified at the hearing.  [Tr. 391.]  She described Angel as being a very different man than the one she married 16 years ago.  He could not be around his family now and wanted to leave the room quickly.  He became "panicky and shaky."  [Tr. 329.]  When Angel's wife became ill in the 1990's, Angel took over all of the responsibilities for the family.  [Tr. 393.]  Angel's wife believed he sacrificed himself for her and the children.  Not long after that, Angel began to have these problems.  [Tr. 394.]

At the hearing, the ALJ left the record open for additional medical records but stated he had nothing to ask the vocational expert at that time.  [Tr. 397.]  The ALJ noted he might order a consultative exam depending on the additional medical records he reviewed.

On December 13, 2005, Angel reported to Glasscock that he had "broken down" during the hearing.  He had lost trust in his spouse and believed she was lying to him.  [Tr. 308.]

-23-

### *2006 Medical Records*

On February 17, 2006, Angel told Glasscock that his relationship with his wife was improving. He also said that his physician told him that Angel was taking advantage of the medications. His GAF then was 55. [Tr. 307.]

On April 16, 2006, Glasscock noted that Angel experienced an increase of anxiety when his child had a first communion. Angel believed that a lot of the problem stemmed from his being overweight and not feeling good about his obesity. [Tr. 305.] His GAF was 55.

On April 18, 2006, Glasscock wrote a letter to the Income Support Division on behalf of Angel. She stated she had treated Angel since August 29, 2003, and that Dr. Sacks evaluated him on October 16, 2003. [Tr. 306.] Angel was being treated for severe paranoia, panic disorder with agoraphobia and major depressive symptoms. He had been reliable with follow up care and medical management. Angel had repeatedly attempted to secure work but was ultimately unsuccessful because of the severity of his paranoid ideation and anxiety. Even with medication and therapy, Angel was unable to leave his home. Glasscock concluded Angel was unable to work because of severe and debilitating symptoms and requested that Income Support endorse his request for assistance.

On September 6, 2006, the ALJ issued an unfavorable decision denying benefits to Angel. [Tr. 16-21.] On November 6, 2006, Angel's representative wrote a letter in support of Angel's request for appeal. [Tr. 9.] The Appeals Council considered the letter but denied the request for review on April 6, 2007. [Tr. 5.]

## Discussion

Angel argues that the ALJ erred in using the grids at step 5 and by not using a vocational expert when there was evidence of a severe nonexertional impairment, failed to properly assess the severity of his mental impairments, and failed to adequately consider the opinion of the treating sources. [Doc. 20.]  Defendant rejects these arguments and contends that substantial evidence supports the ALJ's decision and that the decision was a correct application of the regulations. [Doc. 22.]

## I.      ALJ'S USE OF GRIDS

The grids consider only exertional or strength impairments. _Hargis v. Sullivan_, 945 F.2d 1482, 1490 (10th Cir. 1991). Exclusive resort to the grids is inappropriate when evaluating nonexertional limitations, such as a severe mental impairment. _Grimiar v. Sullivan_, 966 F.2d 1326, 1333 (10th Cir. 1992).  An exception to this general rule, however, allows an ALJ to use the grids as a "framework" for evaluating disability when non-exertional impairments are present, and when combined with evidence such as testimony from a vocational expert. _See_ _Thompson v. Sullivan_, 987 F.2d 1482, 1488 (10th Cir. 1993); _Hargis_, 945 F.2d at 1490.  For example, where there are nonexertional limitations, a vocational expert generally must be consulted to determine whether a

significant number of jobs is available in the national/regional economies that the claimant can perform despite the impairments.[37]  Cruse v. U.S. Dept. of HHS, 49 F.3d 614, 619 (10th Cir. 1995).

Here, the ALJ determined, at step 2, that Angel had severe impairments consisting of depression, obesity and diabetes mellitus.  [Tr. 18.]  Judge Johnson concluded that none of the severe impairments, either singly or in combination, met a listing and then, at step four found that Angel could not perform any of his past relevant work.  Thus, the evaluation proceeded to step 5, where "the burden shifts to the [agency] to show that the claimant retains the . . . RFC to do other work that exists in the national economy."  Thompson, 987 F.2d at 1487 (internal quotation omitted).

While the ALJ had a vocational expert available at the hearing, he found no need to have the expert testify.  "I'm not sure I've got anything for the vocational expert now."  [Tr. 397.]  The ALJ further stated that after he reviewed additional medical records, he was going to consider "very heavily a consultative exam."  [Tr. 397.]  However, after review of additional medical records, the ALJ did not order a consultative exam.  Instead, the ALJ relied on the Grids for his finding that Angel did not have a disability.  [Tr. 21.]  Judge Johnson stated, in part:

> The [grids] contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational factors.  The Medical-Vocational Guidelines [grids] are used as a framework for the decision

---

[37]In arguing that the ALJ properly used the grids as a framework in determining that Angel was not disabled, the Commissioner refers to an Acquiescence Ruling 01-1(3) for the Agency's policy on "framework decisions."  [Doc. 22, n. 3.]  That Ruling, while not cited in any published Tenth Circuit opinion, provides that in cases where a person comes "very close" to meeting the criteria of a grid rule directing a finding of not disabled because it is clear that the additional nonexertional imitation has very little effect on the exertional occupational base, the Agency may rely on the framework of the grid rules to support a finding that the person is not disabled without consulting a vocational expert or other vocational resource.  The ALJ did not mention this Acquiescence Ruling, nor did he directly discuss whether Angel came "very close" to meeting certain criteria of a grid ruling, etc.  Moreover, the Acquiescence Ruling itself states that it "applies only to claims in which the claimant resides in Delaware, New Jersey, Pennsylvania or the Virgin Islands. . . ."  AR 01-1(3), 2001 WL 65745 at *4 (S.S.A. Jan. 25, 2001).  Thus, it appears to have no applicability to the present case.

> when the claimant cannot perform all of the exertional demands of
> work at a given level of exertion and/or has any non-exertional
> limitations. When all of the criteria of a [Grid] are met, the existence
> of occupations in the national economy is met by administrative
> notice.
>
> . . .
>
> Applying the claimant's residual functional capacity and vocational
> factors to the above cited Guidelines, the framework of Medical-
> Vocational Rules 201.24 and 201.25 direct a finding of "not disabled."

[Tr. 21.]

The ALJ determined that Angel's diabetes mellitus was reasonably controlled with medication.
[Tr. 20.] He also carefully analyzed whether Angel's obesity might increase or decrease the severity
or functional limitations of other impairments. [Tr. 19.] The ALJ concluded that the "functional
limitations resulting from the claimant's impairments are less serious than he has alleged." [Tr. 19.]
While not specifying his findings about Angel's obesity, the Court presumes that the ALJ determined
that obesity did not prevent Angel from engaging in all work-related activities.        After a "complete
review" of the evidence concerning depression, the ALJ found that Angel was mildly restricted in
activities of daily living, moderately restricted in maintaining social functioning, and had mild to
moderate difficulties in maintaining concentration, persistence of pace, and had no episodes of
decompensation for an extended duration. [Tr. 20.] In so finding, the ALJ referred to a number of
comments in several of Angel's medical records. [Tr. 19.]

The medical record notations relied upon by the ALJ are primarily those comments that were
somewhat positive. On December 10, 2002, Angel's medication was effective and his appetite and
sleep were intact. [Tr. 19.] Angel's mental functioning on December 10th was good, and he was
observed as fairly stable on his current medications. On February 3, 2003, Angel indicated he was

doing fairly well and that his paranoia was not quite as bad as it had been.  [Tr. 19.]  His mental status examination was well within normal limits on that day.  On September 20, 2004, Angel was able to get out of the house to go to his son's ballgames.  On November 15, 2005, the healthcare provider noted that Angel was doing better.  [Tr. 19.]

It is well settled that an ALJ is not required to discuss each piece of evidence provided he discusses the uncontroverted evidence he chooses not to rely on, as well as significant probative evidence he rejects.  Clifton, 79 F.3d at 1009-1010.  Here, substantial probative evidence exists that was not mentioned.  For example, in addition to the few notations of good days Angel had, there are numerous records indicating Angel was suffering from paranoia, delusions, anxiety, and depression.

On November 20, 2002, Angel felt "persecuted."  He complained of "depression and anxiety."  On December 10, 2002, Angel presented the record indicates "low self esteem and discouragement."  [Tr. 189, 191.]  During his face-to-face interview with social security on December 5, 2003, Angel was having trouble breathing, understanding, concentrating, answering, walking and writing.  The interviewer stated Angel became angered very easily and that it was a difficult interview.  [Tr. 116.]

The mental health and medical records repeatedly show that Angel had trouble holding onto jobs for any length of time because of paranoid thoughts and anxiety, including his feeling that people were "out to get him" and were talking badly about him on the job.  [Tr. 327, 273, 325, 324, 322, 317, 197, 186, 332, 334, 330, 331,157, 172, 190.]  It is uncontroverted that Angel did not hold onto a job for more than 8 months to a year and that he held 13 to 15 jobs in a period of three years.

Moreover, Dr. Sachs performed an independent psychiatric evaluation on October 16, 2003, in which Angel tested positive for "anxiety, depression and paranoia."  [Tr. 331.]  His depression was appreciably stronger than his anxiety.  Dr. Sachs thought Angel might benefit from the use of anti-

-28-

psychotic medications.  Dr. Sachs further noted that Angel felt he was the target of a conspiracy and that his depression had some psychotic features.

Also not mentioned by the ALJ are the numerous medications Angel was prescribed including medications for depression, anxiety, mood disorders, and psychosis – Prozac, Xanax,  Prolixin, Cogentin,[38] Thorazine, Stelazine, Geodon, Risperdal, Zoloft, Buspar, Serzone, Seroquel, Lexapro, Abilify, Haldol, Wellbutrin, Lithium, Cymbalta, Klonopin, Ativan, and Lorazepam.  [*See* discussion of medical records *supra*.]  In addition, Angel regularly took his medications, attended therapy sessions and medical appointments from November 20, 2002  through April 2006.

Moreover, the ALJ's reliance on the fact that "no treating source [had] assessed limitations on [Angel's] ability to perform physical work related activities" [Tr. 20] is misplaced.  "The absence of evidence is not evidence."  Thompson, 987 F.2d at 1491.  The ALJ's questions to Angel at the hearing were cursory with respect to the physical requirements of working, Angel's ability to work, and the effect of his nonexertional impairments on his activities.  Angel was not asked about and did not concede his ability to do the full range of sedentary work.

Generally, when a claimant has a nonexertional limitation, such as that described in this record, the ALJ may rely on the grids as a guide or "framework" for evaluating disability, when combined with evidence such as testimony from a vocational expert.   Here, there was no testimony by a vocational expert.  *See* Ramirez v. Astrue, 2007 WL 4124475 at *3 (10th Cir. Nov. 20, 2007) (". . . the grids may be used only as a guide or framework, and the Commissioner must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform.")

---

[38]Some of these medications were prescribed in 2001 or more than 12 months before Angel's 2003 benefits application.

(internal citations omitted). *See also* <u>Allsbury v. Barnhart</u>, 460 F. Supp. 2d 717, 721-22 (E. D. Tex. 2006)[39] ("The grids establish whether there are available jobs in the national economy for claimants with *exertional* impairments. They do not establish jobs that exist . . . at various functional levels for claimants with solely *nonexertional* impairments.") (emphasis in original) (internal citations omitted).

Exceptions exist as to the need for vocational testimony. <u>Ramirez,</u> at *4 (internal citations omitted). For example, vocational expert testimony might not be necessary where a nonexertional impairment has a negligible effect on the range of jobs available or where the claimant has no significant nonexertional impairment and the claimant can perform most of the jobs at a particular exertional level. In this case, the ALJ did not make any express findings to the effect that Angel's depression had a negligible effect on a range of jobs available. The ALJ did not discuss "range of jobs." Nor would there be substantial evidence to support a finding that Angel's depression and paranoia were negligible. Moreover, the ALJ's determination that Angel suffered from a severe impairment, including depression, contradicts a finding that the impairment was not significant.

Although the ALJ stated that he used the grids as a "framework" for his decision, in essence he relied exclusively on the grids for a finding of non-disability. The ALJ stated that the grids "direct" a finding of "not disabled," without any reference to any vocational evidence. [Tr. 21.] "The grids–limited by definition to administrative findings for persons suffering from *exertional* impairments–do not naturally or logically illuminate the separate inquiry concerning scope of disabling effects of *nonexertional* impairments." <u>Allsbury</u>, 460 F. Supp. 2d at 722 (emphasis in original).

> Noting this disconnect early on, Professor Capowski observed that the Commissioner's regulations "*provide little guidance, however, on how*

---

[39]The Eastern District of Texas opinion is not binding on this Court. However, the Court finds some of the reasoning pertinent and persuasive.

> *to apply this framework in deciding cases."* John J. Capowski,
> <u>Accuracy and Consistency in Categorical Decision-Making: A Study
> of Social Security's Medical-Vocational Guidelines--Two Birds with
> One Stone or Pigeon-Holing Claimants?</u>, 42 MD L. REV. 329, 342
> (1983).   Professor Capowski specifically mentioned mental
> impairments as an example of a nonexertional limitation for which the
> grids most likely could not serve as a framework of reference.  <u>Id.</u> at
> 351.  He predicted: *If nonexertional impairments and the framework
> concept are taken seriously, given the number of situations in which
> the "grid" is to be used as a framework rather than conclusively, the
> exceptions to the rule may outnumber the situations in which the
> categorical rule itself applies.*  <u>Id.</u> at 360.  Professor Capowski also
> suggested that logical extension of the framework concept would
> mean that vocational experts would be unlikely to be called to testify
> at administrative hearings.  And, since the grids provide little or no
> guidance on how the framework concept can be used in individual
> cases, *ALJs would be involved in vocational judgments they are
> completely unqualified to make.*  <u>Id.</u> at 363.

<u>Id.</u> 722 (emphasis in original).  The Eastern District of Texas Court proceeded to note that the

Commissioner attempted to bolster the regulation through a series of interpretive rulings, including

SSR 83-14.  <u>Id.</u> at 722-23.  "In theory, the Commissioner's interpretation and intended procedures

appear rational, plausible, practical, and without obvious constitutional flaws.  *In application*,

however, the 'framework' exception often is bastardized to the point that consulting the grids as a

'framework' is nothing more than a codeword for direct application of the grids."  (emphasis in

original).  The Court further observed that when the ALJ enlists the services of a vocational source

or VE, usually courts find no reversible error in the ALJ's use of the grids as a framework.  <u>Id.</u> at 724

n. 12.

     The Court determines that ALJ relied on the grids exclusively without any vocational

evidentiary support when Angel's impairment was solely nonexertional.  The Court concludes that

this was error under the facts of this case and that the ALJ's decision was not supported by substantial evidence.

Because the Court is remanding for additional administrative proceedings, the Court does not address Angel's other arguments in support of reversal.  If the ALJ again denies Angel's application at step 5, the Commissioner must obtain expert vocational or other vocational evidence regarding Angel's ability to perform a range of work unless the ALJ can provide a reasoned statement as to how the grids provide a framework for the decisionmaking.  Upon remand, the ALJ should also consider the need for a consultative exam, particularly in view of the ALJ's finding that the opinions of Angel's treating source were not supported by the overall evidence and the Court's observation that commentary from some medical records was selectively quoted by the ALJ.

IT IS THEREFORE ORDERED that Angel's motion to remand for a rehearing [Doc. 20] is GRANTED, and that this matter, therefore, is remanded for a rehearing so that the ALJ can address the issues described herein.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge